Before we get to the cases, I thought I'd note today is the 80th anniversary of the attack on Pearl Harbor. I'm guessing down the street they're doing something at the World War II Museum, but it's certainly a day to think about all the lives that were fought in the war against fascism once America had entered World War II. And I, in particular, I can't help but think of our beloved colleague, Judge Tom Reveley, who passed away last year, who a son of East Texas, who after that day, 80 years ago, joined the Navy, spent four years, including being on the destroyer that escorted President Roosevelt to the Yalta Conference, and then after that service in the military, spent more than half a century as a judge in both state and federal courts, continuing his public service. So he was really one of the greats of the greatest generation, and we miss him dearly, and think of him especially today. With that, as Judge Reveley no doubt would want us to get to work, so we will turn to the first case, which is United States v. Swenson. We'll first hear from Mr. Herman. May it please the Court. Simone Swenson raises three issues on appeal. First, with regard to her conviction. The evidence was insufficient to support the sole count of mail fraud, which is a violation of one specific check in connection with a specific prospective adoption through Swenson's adoption agency. The second issue deals with sentencing. The district court applied the wrong legal standard to assess a vulnerable victim enhancement under the guidelines, and by applying that wrong standard made a clear error on the specific facts of this case. And then finally, the third issue deals with restitution. The district court imposed a restitution award that exceeded the statutory maximum by including an amount for an act that was neither proved to be criminal nor proved to be part of the underlying scheme of the one count of conviction. So on issue one on the conviction, Ms. Swenson is asking the court to reverse that conviction because there's insufficient evidence on two of the three elements of mail fraud, the scheme to defraud and the intent to defraud. The important legal principle that applies in this case has been stated throughout many of this court's cases. Each count of mail fraud is a separate offense to be judged on its own. The court made that clear in Tensor, Blocker, and Inglis cases that we cited in the briefing. In each of those cases, the court examined each count of mail fraud and looked for a relationship between that particular mailing and a fraudulent statement or misrepresentation. In many of those cases, there was sufficient evidence to be there, but the court didn't hesitate for specific counts to hold that there was insufficient evidence and to reverse those convictions. In Inglis, the court found that there was even a generalized scheme to defraud but found that the particular accusation of mail fraud was unfounded because that mailing was not related to that overall existing general scheme. So the primary point here, as the court made clear in Tensor, is that the count of mail fraud isn't to be judged in relation to just an amalgam of facts drawn from different parts of the case. It's a relationship between the exact mailing and a fraudulent misrepresentation or other false statement. If we apply that to this particular case, the facts of this case, the one count of conviction deals with a check sent in the mail on September 18, 2013. It was sent by a prospective adoptive family, the Nedricks. It was sent in response to a request that Swenson had made of them for payment of birth mother expenses so that they could be matched with a particular child who was going to be put up for adoption by Ashley Smolt. In this case, we know that there was no false statement leading up to the mailing of that check. The government's own witnesses, including the birth mother, Ashley Smolt, confirmed that, yes, indeed, she was pregnant. She was intending to put her child up for adoption through this adoption agency. The contract was placed in evidence by the government to confirm that. She herself testified that Swenson had incurred expenses for Ms. Smolt's upkeep, including travel, lodging, subsistence, not just for her but for two companions who had accompanied her to Texas for purposes of this adoption. We know from Katie Kelly, another government witness who had worked for Swenson, that the payment of these types of expenses was a contractual obligation that was necessary to solidify or confirm the matching of a prospective adoptive family with the birth mother. And the government put that contract into evidence so that the court can see that that was, indeed, a contractual obligation that the NEDRCS incurred. So there was no falsehood in that regard. The government's primary theory throughout has been that there was double matching, meaning that Ms. Swenson asked for the money from the NEDRCS and was also asking for the money from someone else in this case. And you're trying to draw this clear dichotomy between, you know, generalized fraud and the mailings and the transactions in this case. I guess I'm not so sure it's such a sharp dichotomy, though. I mean, the whole question is, as you're going through, you know, at the time of this check, was she intending to double match or did that just come about later? Isn't it relevant to that inquiry, the testimony of the insider, Ms. Kelly, who said that double matching was going on, or the witness from the state who also said she investigated and there was evidence of double matching? In other words, if there's generalized evidence that this was a practice, can't that inform what the jury was allowed to believe about what was in your client's mind when these checks were going back and forth? That's what this court rejected in Tensor, because the same basis was the argument that the government had made there. There was so much fraud in Tensor concerning the various mailings in that health care fraud or Medicare fraud case that the court could simply look to all of the other aspects of fraud and determine that the specific counts were fraudulent as well, because they were, in a sense, tainted by what else had been going on. And the court rejected that argument, finding that the specific checks needed to be related to some form of a specific fraudulent misrepresentation. Right, and I understand that, but in making that more narrow, individualized inquiry, isn't it, can't the jury consider what was generally going on in determining, you know, because it's this timeline and it's, you know, what did she think on this date versus three days later? You're saying it's not relevant at all, the testimony about the general practice. It is relevant in the sense that they were presented with four different counts, four different people that the government was claiming had engaged in this type of double matching, but also just because the witness says double matching occurred doesn't mean it happened if the actual facts that those witnesses testified to established that it really didn't occur. In other words, she had a perception that double matching occurred, but the testimony from those who actually participated, Ms. Smolt, Ms. Swenson, the emails from the NEDRICs, the emails from the employees, established that Ms. Smolt was simply wrong in stating that double matching had occurred. And, of course, the focus here is on whether mail fraud occurred, not double matching itself. As the state regulator stated, double matching isn't even a state violation in terms of regulations, and so what we're concerned with is the mail fraud requirement of a scheme to defraud rather than their characterization that was then belied by the very facts that the government put on. Could a reasonable jury have concluded, based on what came about later, what happened later, that Swenson at the time did harbor this intent to defraud the NEDRICs back when she requested the money? I'd say there are two responses to that. The first response would be the Supreme Court case of Schmuck, where the Supreme Court said that the time for determining whether the scheme to defraud exists is the time that the mailing occurs, not necessarily by what has occurred afterwards. But perhaps more important than that, depending on what we're looking at here, whether it's the scheme to defraud or the intent to defraud, what happened afterwards that would eliminate a basis for an inference of the intent to defraud was the return of the check. Anise NEDRIC herself testified that this check that she mailed on September 18th, it wasn't cashed, it wasn't deposited into the account, it was simply returned to her in that same format afterwards. So if the jury were looking for a basis for an intent to defraud, it's not in the lead-up to what happened on September 18th with the mailing of that check, and if we're looking at what happened afterwards, what the jury was presented with was simply the return of the check. And more importantly, as of September 17th, through all the email traffic, Simone Swenson stopped asking for money from this family on that date. By that date, that family had told her three separate times, we haven't mailed the check, we haven't mailed it, we haven't mailed it. And so at that point, she stopped asking. And it was only at that point that she then moved on to another family. And while it's true... You rely in your brief, there's an 11th Circuit case, Takaloff, Takaloff, I'm not sure the pronunciation, but that case kind of recognized this fraud after the fact theory, that deception after the funds were sent could qualify as wire fraud. And given the evidence introduced at this trial, could a reasonable jury have convicted your client under this fraud after the fact theory raised in that case that you cite? Again, if what we're looking at is the intent to defraud, so the intent to defraud would go to whether Simone Swenson had the purpose of obtaining a personal benefit or enrichment for herself or harming the Niedrichs. And again, the fact that the cashier's check was returned uncashed is essentially the key to that determination. Because any inference to defraud at that point would need to say that there had been something that had been even if only temporarily, even if only gaining the benefit of it for a short period of time. But that's not what happened. Instead, the check was simply returned. So I'm not going so far as to say that that can never be the case, but in the facts of this case, that simply not what occurred on that element, on intent to defraud in particular. I want to ask a little bit more about the timeline. The Niedrichs... I mean, with the September 19th, the money comes in from the other family, correct? Correct. And the Niedrichs aren't told about that. And even a few days later, they're emailing, saying, what's the status on the baby? And then, you know, what they're ultimately told, I think, is just the birth mother changed her mind, which is the case. But, I mean, they're never... are they ever told about the other family? If this really is just, well, they weren't paying, so we're going to the other family, it would seem you would communicate that to them. I don't believe that they were told in... to that degree, to that degree of detail, that there was another family waiting in the wings. And so, in that case, it would be an omission after the fact. Again, I would make the same response in terms of the timing of that omission that had occurred afterwards. But also, if we look at that timeline, that's a one-week period during which the person, Ashley Smolt, actually gave birth, during which the effort essentially blew up in terms of matching her with anybody. All of that occurred during that same time period. It was only two days later that the employee of Swenson actually called or talked to the Niedrich family and told them that they weren't going to go through with the adoption with that family. And you're right, I don't believe they told them that... the exact reason for that. Right, so it could seem... I mean, couldn't a jury think consistent with a double-matching fraud is never telling the other family, the Niedrichs, that there now was another family who was paying, and that's... you know, it's not just that the mother didn't give the baby, it's that the baby was going to go to another family. That could be the case. Again, we're dealing with two separate elements. One, a scheme to defraud, so if the court were to say that there was an overall scheme to defraud that this was a part of, still there has to be the intent to defraud. And I would concede that that would be the case if Simone Swenson had cashed this check, or if she'd used it in some way. But to return it uncashed in the same form that it was received, right in the same process, eliminates any inference of an intent to defraud in the sense of harming the Niedrichs, because there was no harm to them, there was not even an indication of an intent to harm them, in part because they, the employees of the Swenson agency, were asking for reimbursement of true expenses, expenses that had actually been incurred, legitimate expenses that the state regulatory official said were expenses that the state of Texas permits to be charged back to these families, and then when another family paid it, instead of keeping the money, the Swenson agency simply returned it in the same form that it had actually been received. I mean, I understand a scheme to defraud. You're saying that giving back the check has such importance. Obviously, that's a strong argument to a jury. But, I mean, a scheme to defraud doesn't have to be successful to be a crime, right? Let's say someone comes up with a story, oh, I found, you know, oil out in West Texas, and it's a complete lie, and he gets a bunch of checks from people because, oh, why don't you invest in my oil well that doesn't exist, and then a week later, he says, ah, you know what, not such a great idea, or maybe I'm going to get caught or whatever else, and he gives back the checks. Is that a, is that fraud or no? It would be in the case that you're presenting because you presented it from the beginning as the investment was based on a lie. Here, we actually had a child. We had a family that was offered the opportunity to adopt that child. Niedrich and Swenson both progressed forward in an attempt to make that work. It was only after three times of the family failing to perform the condition precedent that Swenson moved from that family to another family. So that's why it's different. There wasn't this fraud in the sense of a lie about is there a baby? Is there an adoption that's going to happen? Is Swenson paying these expenses? And then the other point would be what you're mentioning, Judge Costin, what you're referring to is the scheme to defraud, and so even if there were some issue related to an omission, there still also has to be enough evidence to meet that separate element of the intent to defraud, which requires some evidence to say that Simone Swenson was seeking her own personal enrichment or she was seeking to harm the Niedrichs, and it's on that intent to defraud that I offer to the Court that the return of that check in its actual same format, that that goes to the intent to defraud more than the scheme to defraud itself. But it shows that there was an absence of evidence from the way we've presented it in terms of not a double matching but a sequential matching under the terms of a contract from one family to the next family, and then an absence of an intent to defraud in the sense of no personal enrichment and no intent in that check. On personal enrichment, the government has referred to an email where Simone Swenson mentions a $1 million figure. That email is in the evidence, and it shows that the entire context of the email was Simone Swenson telling her employees, we're bringing in so much money in terms of physically bringing it in, we need to get our financials in order. The email is all about getting the expense reports right, providing the families with the information, providing partial refunds, not that Simone Swenson or her employees are doing what this Court has found in other cases, using those for their own housing, for their own personal luxuries, or whatever it might be. We took up a lot of your time. If you want to touch on the sentencing, I'll give, Ms. Pollard, give both sides two extra minutes, and you can touch on the sentencing if you'd like. Yes, Your Honor. On the sentencing issue, the vulnerable victim enhancement, the two things that I would like to briefly mention on that relate to the District Court simply applied the wrong standard to determine what is a vulnerable victim. The Court has long said that a vulnerable victim is someone with an impaired capacity to prevent or detect the crime, or an impaired ability to resist that crime. Here the District Court turned that on its head, however, by saying straight out in the Court's denial of the objection that issues related to the sophistication of these prospective parents didn't have any bearing on the outcome. In other words, those exact qualities that would show that they were not impaired, that they, in fact, had a greater capacity in some respects than others, such as their educational attainment, their own professional status, and, very importantly, their use of advisors, like adoption attorneys and professional adoption facilitators who, in a sense, supervised this whole process for them, those were discounted by the Court as being irrelevant from the beginning. The Court also focused in very strongly on the emotion. And while the emotion certainly is one factor that can be taken into account as a lesser ability, the Seventh Circuit in Esterman made it very clear that there needs to be a balance of those factors that offset that emotion. In other words, privileging one factor but refusing to look at other factors like these issues of capacity is where the District Court went wrong in this case. And if the District Court had looked at these particular families, she would have seen exactly what I've referred to, like the use of these professional adoption advisors. So in that case, the Court made essentially a broad class-based determination that all of these families, just because of that emotion, qualified as vulnerable victims. This Court has also insisted on an individualized analysis. The Wilcox case is a perfect example of that, where the Court said just minority does not qualify someone as a vulnerable victim, but instead looked at the specifics of the relationships between the parties to determine actual vulnerability as opposed to an attributed vulnerability based on emotion. Thank you, Your Honor, for allowing me the extra time. All right. And you'll have five minutes for rebuttal. Ms. Wilson. May it please the Court. Swenson is misapplying the standard of review for count four hair. She wants to isolate what evidence does or does not exist, but this Court has to view the evidence in favor of the verdict. Here, the jury evaluated the credibility of the witnesses and rejected Swenson's testimony. The jury concluded that the evidence proved beyond a reasonable doubt that Swenson matched prospective parents, the Niedrichs, and the Smolt. Five people at trial testified about the double-matching scheme. Prospective parents Anise Niedrich, prospective parent Daniel Custieri, birth mother Ashley Smolt, former employee Katie Kelly, and the Texas Health and Human Commission director, who at the time, did not know that the Niedrichs had the money. The Niedrichs were told that Ashley had chosen them as the birth mother. The Nausses and Swenson knew the Niedrichs had the money. According to Anise, she had communicated with Swenson and Nauss numerous times by voicemail. Custieri explained how he was told that the other family, which clearly meant the Niedrichs, no longer wanted to adopt the Smolt baby. Ashley, the birth mother, said numerous times that she had chosen the Niedrichs and nobody else. When she chose the Niedrichs, Swenson told her that was a perfect match. When Ashley received money, which was very little, as she testified, she was told this money was for the Niedrichs. Kelly, the former employee, the whistleblower, discovered the Custieris and the Niedrichs had been double matched with Ashley. And when she asked questions and reported it, her resignation was immediately accepted and she was told not to come back. But did the agency ever take money for this adoption or any of the others? Was there proof that they were basically getting paid twice for the same adoption expenses? Well, if you mean whether they cashed the check, which is what... Right, whether the defendant enriched herself, you know, double recovered basically on a particular adoption. It was undisputed the check was not cashed, but the jury equally could have concluded that it was not cashed because Swenson was starting to panic. On the 24th, Kelly, the employee, gave her notice of her resignation. She was still working. On the 27th, she discovered the double matching, as I just said. Swenson clearly started to panic because she told her not to come back and that may have been one of the reasons the check wasn't cashed. The jury could have... Was there some overall scheme, as Kelly testified, as the state seemed to testify, was there evidence of double recovery on other adoptions? Well, that's where we get into what the jury rejected. And if you look at that closely, I'm speaking as the appellate lawyer, not as a trial lawyer, there were some timing issues because we would say that it was charged on a certain date, but then somebody stopped paying, was directed to stop paying, but there was no overlapping of the funds. Speaking as an appellate lawyer, I would say that's probably how the jury came to reject the wire fraud counts and judge... Because there were only four counts. Right, but usually, as you know, in these cases, there's usually a federal fraud prosecution. There's all kinds of fraud going on and, you know, the prosecution just gets a few mailings and wires to highlight, but there's a broader fraud involving multiple people. We don't have that here. There wasn't that kind of evidence. I believe that there was and the prosecutors elected these four counts, but I, of course, am limited to the appellate record. As we are. Right, so... The record, whatever happened out there in the real world, in the trial, there wasn't evidence that, you know, they were getting checks for the same expenses all the time on different adoptions or anything like that? It was not, no. Those specifics were not developed in full. However, when Tila Johnson, the director or the manager of the Human Health, when she confronted Swanson with the double matching and what, in fact, what she testified, she had found it multiple times. She didn't discuss the details, so I don't know whether they were limited to these counts or some additional counts, but the point is, when she confronted Swanson with it, Swanson explained, well, a lot of times these birth parents back out, so I need to have somebody in line. So Swanson wasn't really denying that she had done that, but if you're talking about following the money trail in relation to count four, what we have is the money was deposited as to the Custieri's, but the Custieri's were the second match out of the count four. But going to what she said, I mean, there's nothing wrong with having a backup because, you know, you need to be prepared. There's a lot of uncertainty here. Except the parents don't know, and if you're taking that money and you're cashing it, and don't... Well, that's why I'm asking about the money, because to me it's about the money. But don't forget that Swanson had already gotten the first, excuse me, the down payment, they called it the agency fee, from the Neidrich's in July. That was already pocketed. And then she had also taken the half installment or the half of the agency from Custieri in June, and that was pocketed. So now what we're talking about here in relation to the Neidrich's were the birth mother expenses. That's the only thing they would owe, because they had already paid their agency fee. Custieri was a little bit different, because he had never paid his full agency fee. So he still owed 50% on that, and then the additional monies that were related to Ashley Smolt's birth mother. But you do agree that Swanson earned nothing from this alleged deception? No. I mean, can you point to another case where a defendant returned all the money and was still convicted of mail fraud? She didn't return all the money here. She deposited, she received the agency fee from both the Custieri's and the Neidrich's, and she also received— Does the complaint allege those agency fees were obtained fraudulently? I believe that they did, that all the monies were. But the other thing is she did obtain and deposit the money from Custieri. So she definitely got something in relation to this Smolt transaction, if you want to call it that, the Smolt birth. But as Judge Costa pointed out, I mean, it doesn't have to succeed. That was the intent. And the jury easily could have concluded that there was a panic situation going on, because Kelly was obviously very thorough and very inquisitive with her boss. All of this led to so much discomfort. That's what led her to seek another job. And she immediately reported Swenson to the FBI, the Texas AG, and a host of others. And so the jury was free to conclude that Swenson was probably very nervous about what was going on with Kelly. And you also have to remember that most of these events also occurred less than one week. A lot of the fraud cases we have are even years. And a lot of this was fast and furious. And I believe it was Judge Costa who asked about whether the Niedrichs were ever notified about the Custieris, and the answer was no. And not only that, after Swenson reached out to Custieri, Nouse, who was her right arm and her best friend, continued to communicate with the Niedrichs. And not only, as Judge Costa pointed out, did she call on, I believe it was the 26th, to say that Ashley had had her baby, which suggests that the match still existed. But also on the 23rd, Nouse responded to a question about a TB test. So she sent an email, and this is after the Custieri money had been received. And Nouse responds to Anise Niedrich talking about a TB test, because Anise, as she testified, was concerned because nobody would give them a TB test, and how else can you satisfy the Texas requirement of showing you didn't have TB? And so she says, well, you can get an x-ray. And the other thing that's important is, on 9-18, Swenson emailed Nouse at 3.54 a.m., where in the subject line, she said she had to rematch Ashley. So that meant, again, that the match was existing. And Mr. Herman talked about the contract. Well, the contract between the parties requires that you give notice of a termination. And no notice was given. Anise testified to that effect, and the emails that the court has available to it, and there are many, don't show or don't indicate in any way that the Niedrichs were ever alerted about the, if you want to call it the termination. And, of course, Ashley Smolt testified that she never even heard of the Custieris until she was in the hospital, and Swenson tried to get her to have, to let the Custieris have her child. Swenson's testimony was very different in that regard, as it was in many things. Swenson testified that she had gone over, they have these adoption books, that she had presented the adoption book to Ashley beforehand about the Custieris, and Ashley had brought it to the hospital, and Ashley unequivocally denied that. And the jury was the one that was evaluating the credibility of the witness, and they did not find Swenson persuasive. And if the court looks at the testimony, you'll see that many times Swenson disagreed with the other witnesses who were testifying. Swenson stood alone in a lot of her testimony, whereas others corroborated each other, as did the written evidence. Also, there were all these lies that Swenson told, that Custieris, that the Niedrichs had backed out, also that she didn't verify the pregnancies, which suggested that this was about money, that it was not about necessarily doing the right thing, and I realize that's a whole different standard for businesses, or what have you, but it was just further evidence of her intent. And there can't be, there should be no question that she profited from all of this double matching. As I said before, she received thousands of dollars in these agency fees, which were non-refundable. From the Custieris, she received well over $10,000. From the Niedrichs, it was the same thing. The check that the Niedrichs were sending in September was for Ashley's birth mother expenses. They didn't use the word down payment, they used agency fee, but that had already been paid, so she had already profited in that regard. And what they did is they more or less, for lack of a better word, pulled through, or rolled over, and that was the common verbiage that they used. So they would roll over a fee when somebody, when an adoption fell through, and they had to, you know, re-adopt the person, I mean, excuse me, re-adopt a baby. So there was that, I mean, there was that situation. But, so you have the testimony, and then you have all of these emails, and while Swenson may have been internally emailing Nowce about what was going on, those emails were not, or those points were not communicated to the Niedrichs. As far as the Niedrichs knew, they were getting this baby. And she testified, they were in Disney World, they were very excited, they had been leaving voicemails, it was many years ago, so she was having trouble accessing Wi-Fi, there was no Venmo, all of that type of thing. So, so essentially what we have is the jury believed the testimony from the five witnesses, excluding Swenson, and then they had the benefit of all of these emails. So it wasn't a sequential thing, but in fact, it was a double matching at the time. In relation to the vulnerable victim enhancement, the Stover case, which Mr. Herman references, that court chose the need for societal protection over the cancer patients. And in doing so, the court said there's no bright line here. I mean, these cases are very difficult, vulnerable victims. Many cases deal with the status, in other words, that the crime already covers the vulnerability of somebody. That's not true of mail fraud, of course. Here, what we have, too, is a little bit different. Judge Rosenthal, historian of cancer management, well, in addition to that, is a bill that applies to prison reform, federal reform, and this was asked that Judge Swell, these control charges, whether or not those counsel charges are warranted, and he's answer shows the challenges. Right. And that's not here, right? Well, a couple things. Before, I think it was 1995, the enhancement had a targeting element. That's no longer true. But this circuit also does not require targeting. And in this case, you have a very, very experienced judge, Judge Rosenthal, whom everybody highly admires. And this case was unusual. She said so. She even thanked the lawyers for trying it. And she went into, maybe she didn't go into the detail that somebody else might have, but what was different here, she had sat through a five-day trial, she had all these victim statements, she had people testifying about what had happened to them and the different fallout. And while the fallout may not be how this court typically looks at the enhancement, it does show the vulnerabilities. I mean, cause and effect. And Judge Rosenthal had the benefit of all of that. And I believe that she was very clear in why she thought that these people were vulnerable. And concluded, plausibly concluded, the enhancement applied. Alternatively, the error was clearly harmless. Judge Rosenthal, despite the fact that she was disturbed by the facts and everything that happened, she still went ahead and sentenced Ms. Kelly 50% below the bottom of the guideline range. She sentenced her to 24 months. And she was very clear about why she chose to do that, that it was not probation, that she couldn't stay home and that type of thing. And she said repeatedly that this is the sentence that she would impose regardless. She would not have gone any lower, that she had weighed the 3553A factors and she tried to be conservative, those are her words, while being acutely aware of the victim vulnerabilities. And she thought it was appropriate based on all these factors and she recognized the complex nature of the motivations and the impact that the case represented. In relation to the restitution, one thing I think is important to remember here, there's a difference in whether a restitution award is legal and whether the amount is correct. And clearly, we were, excuse me, the victims were entitled to mandatory restitution. And because Swenson was convicted of a scheme, it was the restitution amount was broadened. Custieri clearly was a victim, as I said before. He paid both the agency fee in June, or excuse me, half of the agency fee, paid another half back in September, plus the makeup fees, if you will, and the birth mother expenses. So that's all he got, the $26,000. The Custieris got nothing. All I know from reading the record is there was some type of lawsuit in which they, I believe they were fully, they fully recovered or something happened with them. So it was just, we're just talking about Daniel Custieri. And I cited to you the Easing claim where a defendant had argued she shouldn't be responsible for an entire restitution award because the jury had acquitted her on some of the counts that had been brought against her. But this court said, no, essentially there's no error. And even if it were, or even if we assume that restitution was error, it was far from plain. And the same is true here. The plain error should apply. And unless this court has any additional questions, the government requests the court to affirm. All right. We have your argument. Thank you. Mr. Herman, get your rebuttal. And if you could, during your five minutes, one thing if you could address, the other side said basically there was double recovery on the agency fees. And that really wasn't clear to me from the record. But if you just want to respond to that. Certainly. The government's presentation misunderstood the agency fees. The evidence at trial established, even through the Niedrichs and the Custieris, that what they were paying for and what their contract reflected was that they were paying to engage the services of this particular company, the Custieris. That's why there was an ongoing rolling over when a particular adoption wasn't successful. So there was, they both families did pay agency fees, but you're saying those weren't tied to a particular child or mother? They were not. In fact, that's what Judge Rosenthal found in issuing the judgment of acquittal on count three, because count three did deal with the agency fee paid by Custieris in June. And the court found that was essentially just for engagement of the services overall. It was for the payment of the rent and the other employees and everybody else who was working for this agency at the time. It wasn't pocketed by Simone Swinson in the sense of paying for her house or paying for some other sort of personal luxuries. The government also fails really to recognize what occurred in the communications between the families. Yes, Nowes continued to communicate with the Niedrichs on September 26th. But on that date, she told them, the adoption is not going forward with you. What is essential is what was done to get a payment through the mail. And as of September 17th. I thought you said on September 26th, you said the mother decided against adoption. Right. And so from by that point, the check was already in the mail. The check had already been in the mail. Unbeknownst to Simone Swinson, nobody could testify as to when that actually hit their offices. But at the same time, they had stopped asking for that payment as of September 17th. And that is also important, that this mail fraud statute applies to service providers generally. We get caught up in the emotion of the adoption, but this is the same mail fraud statute that would apply to a real estate broker, an art dealer, and anyone with multiple clients, as Simone Swinson had, who offered an opportunity to take advantage of those services, as she did for the Niedrichs, and gave them three separate opportunities to fulfill the conditions precedent to go forward, when they didn't fulfill those obligations, she simply moved on. And there's been no identification of an obligation as a matter of federal criminal fraud jurisprudence to say that a service provider of any sort, once they've determined that their client is not going to fulfill their obligations and moves on to a second, somehow has a criminal law obligation to wait and to provide notification or to wait and to give that party a time to cure. And it would be better business practices. It might have been a contractual breach, but it certainly wasn't fraud in the context of this case, in either a scheme to defraud or an intent to defraud. The government also mentions, in using the terms lies, for example, that they didn't verify the pregnancy of many of the birth mothers. But once again, that goes exactly to what Tensor dealt with. Whether there were lies or whether there were omissions with regard to some of the other adoptions, that's not what happened here, because we I do want to mention the harmlessness argument that the government discussed. In this case, it's true, Judge Rosenthal gave a downward variance. But Judge Rosenthal made a very specific comment about why she was giving that variance, which the government has ignored. Judge Rosenthal said that she was imposing this variance to put the defendant where she would have been if the court had granted the objection with regard to relevant conduct. And the judge clearly measured the sentencing guideline range by reference to what the defendant had proposed for the loss amount. The judge said absolutely nothing about what she would have done if the vulnerable victim enhancement had not applied. And she said nothing in terms of the 3553A factors that she would have imposed the same sentence regardless, looking at the 3553A factors as a whole. And that's important in terms of harmlessness from this court's cases, including Meacham, where this court said simply referencing those factors is not sufficient in order to make the error harmless in this case. And finally, on restitution, there is some conflict about whether this should be treated as plain error or whether it should be treated as something meriting de novo review. The court's own cases seem to go back and forth. The most recent case of Penn treats this type of a complaint as subject to de novo review, saying that an award in excess of the statutory maximum is always plain error. And then the Craig case, although unpublished, really deals with the third and fourth prong, saying that if you agree that there is error, then it will meet that because of the imposition of a greater monetary penalty on the party. And in this case, it's not just that Judge Rosenfeld granted a judgment of acquittal on that particular amount. It was the reasoning behind it, that there was no fraud in requesting the agency fee in June of 2013, because any scheme to defraud would have begun when Ashley took the picture two to three months thereafter. So for those reasons, Your Honor, we would ask for the court to reverse the conviction, vacate the sentence, and the restitution award. All right. Thank you, Mr. Harmon. The case is submitted.